NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

———————————

CARL P., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, C.P., *Appellees.*

No. 1 CA-JV 21-0093
FILED 9-9-2021

———————————

Appeal from the Superior Court in Maricopa County
No. JD532688
The Honorable Connie Contes, Judge (Retired)

**AFFIRMED**

———————————

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Tom Jose
*Counsel for Appellee Department of Child Safety*

———————————

**MEMORANDUM DECISION**

Presiding Judge D. Steven Williams delivered the decision of the Court, in which Judge David B. Gass and Judge James B. Morse Jr. joined.

———————————

**W I L L I A M S**, Judge:

**¶1**	Carl P. ("Father") appeals the juvenile court's order terminating his parental rights to his child, C.P. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

**¶2**	Father and Tyler C. ("Mother")[1] are the natural parents of C.P., who was born in Colorado in 2019. Before C.P.'s birth, Father was arrested and incarcerated for felony charges, including attempted murder. As a result, Father has never met his child.

**¶3**	After C.P.'s birth, Mother, who was unwilling to parent C.P., left the child with maternal grandmother ("Grandmother"). Grandmother then took C.P. from Colorado to her home in Arizona, where she filed a private dependency petition alleging C.P. was dependent as to both parents. The Arizona Department of Child Safety ("DCS") substituted in as petitioner, alleging C.P. was dependent based upon neglect.

**¶4**	C.P., who has been in Grandmother's care since his birth, remained with Grandmother throughout the dependency. The DCS case manager reported C.P. was happy and well-bonded to Grandmother, and that Grandmother was meeting C.P.'s needs and was willing to adopt.

**¶5**	During the dependency, Father sent C.P. gifts and cards, and also participated in limited services through the prison, including parenting classes. Father also requested video visits with C.P., but despite DCS's attempts to facilitate, they never took place. While the DCS case manager recognized Father's efforts to communicate with C.P., she felt Father had not maintained a normal relationship with C.P. and could not meet C.P.'s needs. The case manager acknowledged that, even if Father were released early on parole, C.P. would remain in care for several more years, thereby "disrupting a normal childhood experience."

**¶6**	The juvenile court considered its jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act, conferring with Judge Billings-Vela from the El Paso County, Colorado District Court. Though Colorado was C.P.'s home state, Colorado declined jurisdiction based on inconvenient forum and ceded its jurisdiction to Arizona. The

---

[1] The juvenile court also terminated Mother's parental rights; she is not a party to this appeal.

juvenile court subsequently adjudicated C.P. dependent as to Father and set a case plan of family reunification.

¶7        At some point, Father pled guilty to the felony charge of assault with a deadly weapon and was sentenced to eight years' imprisonment in Colorado. DCS moved to terminate Father's parental rights under A.R.S. § 8-533(B)(4), alleging Father's incarceration would deprive C.P. of a normal home for a period of years. Over Father's objection, the juvenile court changed the case plan to severance and adoption.

¶8        At the severance trial, the DCS case manager testified that Father has been incarcerated since C.P.'s birth and because of the child's age, it was and would continue to be difficult for C.P. to maintain a normal parent-child relationship with Father. She also testified that because C.P. would be at least six years old by Father's mandatory release date, C.P. would "miss[] out on a connection with Father during [C.P.'s] formative years." The case manager further testified that C.P. was bonded to Grandmother, that severance and adoption offered C.P. a chance at permanency and stability, and that C.P. would be negatively impacted if the court did not terminate Father's parental rights because C.P. would lack a permanent arrangement.

¶9        Father testified that though he never met C.P., he greatly desired a relationship with C.P., that he attempted to nurture a relationship with the child by sending gifts and letters and was working hard while in prison to better himself for C.P. Father also testified that he will be released no later than 2026, but is eligible to move to a halfway house in August of 2022 and is eligible for parole in November of 2022. Father further testified that his three-year parole term would be served in either Colorado or New York.

¶10        After considering the length of Father's prison sentence and its effect on his relationship with the child, *see Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251-52, ¶ 29 (2000), the juvenile court found termination of Father's parental rights was warranted on the grounds of his length of incarceration, *see* A.R.S. § 8-533(B)(4). The court also found severance was in C.P.'s best interests and entered an order terminating Father's parental rights.

¶11        Father timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1), and Arizona Rule of Procedure for the Juvenile Court 103(A).

**DISCUSSION**

**¶12**        We review a termination order for an abuse of discretion, accepting the court's factual findings unless clearly erroneous, *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004), and view the evidence in the light most favorable to sustaining the court's ruling, *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008). Because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," we will affirm an order terminating parental rights if reasonable evidence supports the order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004)).

> I.      *Reasonable Evidence Supports Termination on the Length-of-Sentence Ground*

**¶13**        "To justify termination of the parent-child relationship, the [juvenile] court must find, by clear and convincing evidence, at least one of the statutory grounds set out in [A.R.S. §] 8-533," *Michael J.*, 196 Ariz. at 249, ¶ 12, and find, by a preponderance of the evidence, that termination is in the best interests of the child, *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

**¶14**        Section 8-533(B)(4) provides that a parent's rights may be terminated if "the parent is deprived of civil liberties due to the conviction of a felony . . . [and] the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years." Our supreme court in *Michael J.*, provided a non-exclusive list of factors for courts to consider in determining whether a parent's prison sentence will deprive a child of a "normal home for a period of years":

> (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

196 Ariz. at 251-52, ¶ 29.

¶15　　　　Father argues that, although the juvenile court's order addressed the *Michael J.* factors, it erred by failing to consider the possibility that he would be released early from prison. Though a court addressing the incarceration ground for severance must consider the designated length of the sentence, it is not mandatory to consider the possibility of early release. *Jeffrey P. v. Dep't of Child Safety*, 239 Ariz. 212, 214, ¶ 8 (App. 2016) (noting that the court "may consider the possibility of early release"). Here, the record shows that the court carefully considered the designated length of Father's sentence—eight years—and the impact the sentence would have on Father and C.P.'s relationship. And, although the court did not expressly consider the possibility of Father's early release, it was not required to do so. *See id.*

¶16　　　　Father further argues if he were released early, he would have been incarcerated for, at most, an additional 20 months, which is too short to amount to "a period of years" under A.R.S. § 8-533(B)(4). Father's calculation fails to consider that the "relevant period is the entire period of incarceration, not solely the time after entry of the termination order." *Jeffrey P.*, 239 Ariz. at 214, ¶ 9. Thus, even if Father were released early, he would have been incarcerated for approximately three years, C.P.'s entire life at that point.

¶17　　　　Father also contends the court erred in finding his relationship with C.P. could not be nurtured because of his out-of-state incarceration and C.P.'s age. Father argues that because DCS "did not provide [him] any visits [with C.P.]," he "was never provided an opportunity to demonstrate he could further nurture a relationship through non-traditional means while being incarcerated out-of-state, including video visits."

¶18　　　　The record does not support Father's contention that the court erred. The DCS case manager testified that it is difficult to maintain a parent-child relationship between a young child and an incarcerated parent, particularly one who is out-of-state, because, "the most important relationships [to a child of C.P.'s age] are the ones that are physically available . . . and physically present . . . [providing] nurturing behaviors" such as "keeping the child safe and secure," and that Father was unable to perform those behaviors while incarcerated. The record also demonstrates that DCS attempted to facilitate video visitation and that Father was, at times, the reason that visits could not occur.

¶19　　　　Lastly, Father asserts the court failed to consider his efforts to better himself. To the contrary, the court expressly considered his efforts

but determined that the effects of Father's incarceration, including a "lack of presence . . . lack of support, lack of supervision, lack of nurturing, lack of safety and protection, inability to meet the needs of the child, and lack of permanency," weighed in favor of termination.

**¶20** Reasonable evidence supports the juvenile court's finding that Father's sentence would deprive C.P. of a "normal home for a period of years" based on A.R.S. § 8-533(B)(4) and all of the factors set forth in *Michael J.*, 196 Ariz. at 251-52, ¶ 29.

## II. *Reasonable Evidence Supports the Best Interests Finding*

**¶21** The juvenile court must also find, by a preponderance of the evidence, that terminating the parent-child relationship is in the child's best interests. A.R.S. § 8-533(B); *Kent K.*, 210 Ariz. at 288, ¶ 41. In conducting the best interests inquiry, the juvenile court must find that the child would either "benefit from a severance *or* be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990).

**¶22** Father contends C.P. would not be harmed by a continuation of the parent-child relationship because C.P. "would remain with [m]aternal Grandmother and his needs would continue to be met." However, when severance of the parent-child relationship will benefit the child, the best interests determination may also be satisfied. *See id.*

**¶23** Here, the juvenile court found that termination was in C.P.'s best interests because Grandmother was "meeting all of his needs" and because termination would "further the plan of adoption, which would provide the child with permanency and stability." *See Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 12 (2016) ("When a . . . child's needs [are being met] and the child's prospective adoption is otherwise legally possible and likely, a juvenile court may find that termination of parental rights, so as to permit adoption, is in the child's best interests."); *see also Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998) (a court "may properly consider in favor of severance," factors that include "the immediate availability of an adoptive placement" and "whether an existing placement is meeting the needs of the child").

**¶24** Because reasonable evidence supports the juvenile court's finding that Grandmother is meeting C.P.'s needs, and that C.P. is prospectively adoptable by Grandmother, the court did not err in concluding that termination was in C.P.'s best interests.

**CONCLUSION**

**¶25**   For the foregoing reasons, we affirm the juvenile court's termination order.